# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

VERTICAL AVIATION INTERNATIONAL, INC., ET AL.,

Petitioners,

v.

FEDERAL AVIATION ADMINISTRATION,

Respondent,

———————————

On Petition for Review from the Federal Aviation Administration

———————————

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR A PARTIAL STAY**

———————————

YAAKOV M. ROTH
*Acting Assistant Attorney
General*

ABBY C. WRIGHT
CAROLINE D. LOPEZ
*Attorneys, Appellate Staff
Civil Division, Room 7524
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-4825*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici

Petitioners are Vertical Aviation International, Inc.; Airborne Aviation, Inc. d/b/a Magnum Helicopters; Alex Air, Inc. d/b/a Maverick Helicopters; Aloha Helicopter Tours LLC d/b/a Ali'i Air Tours and Charters, Aris, Inc. d/b/a Air Maui Helicopter Tours; Hawaii Pacific Aviation, Inc., d/b/a Mauna Loa Helicopters; Island Helicopters Kauai, Inc.; Jack Harter Helicopters, Inc.; Novictor Aviation LLC d/b/a Rainbow Helicopters; and Safari Aviation, Inc., d/b/a Safari Helicopters. Respondent is the Federal Aviation Administration. To date, no amici have appeared in this Court.

## B. Rulings Under Review

Petitioners challenge three guidance documents issued by the Federal Aviation Administration on November 12, 2024. These documents are: (1) Advisory Circular 136-4, (2) Notice N8900.718, and (3) Order 8900.1, vol. 3, chap. 18, sec. 4 (Change 943).

**C.    Related Cases**

This case has not previously been before this Court or any other court. Counsel is not aware of any other related cases currently pending in this Court or any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

<div align="right">

/s/ Caroline D. Lopez
Caroline D. Lopez

</div>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................iv

GLOSSARY .........................................................................................vii

INTRODUCTION ............................................................................... 1

STATEMENT ........................................................................................ 3

ARGUMENT ........................................................................................ 9

I.      The motion is procedurally improper. ............................................10

II.     Petitioners are unlikely to prevail on the merits.......................... 12

        A.      The challenged actions do not constitute final agency
                action. .................................................................................. 12

        B.      FAA's actions were consistent with any applicable APA
                requirements. ...................................................................... 14

III.    The other equitable factors weigh against a stay pending
        appeal.............................................................................................20

        A.      Petitioners fail to demonstrate irreparable harm. ...............20

        B.      The public interest weighs against a stay. ...........................22

        C.      If the Court grants a stay, it should tailor the stay. ............23

IV.     The government would agree to an expedited briefing
        schedule. .......................................................................................24

CONCLUSION .................................................................................25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

# GLOSSARY

FAA                        Federal Aviation Administration

OpSpec-B048      Approved Operations Specifications for Commercial Air Tour Operations Below 1,500 Feet Above The Surface In The State Of Hawaii

## INTRODUCTION

A longstanding regulation generally prohibits air tour operators in Hawaii from flying below an altitude of 1,500 feet "except when necessary for takeoff and landing, or operating in compliance with an air traffic control clearance, or as otherwise authorized by the Administrator." 14 C.F.R. § 136.75(d)(1). Tour operators in Hawaii have historically operated under authorizations provided by the Administrator permitting flights below 1,500 feet in certain geographical areas and with certain safety constraints. After air tour accidents in Hawaii nearly doubled over the course of seven years, including causing thirteen deaths, FAA sought public comment on new advisory circular guidelines regarding operator deviations to fly below 1,500 feet in this area.

On November 12, 2024, FAA issued three, related guidance documents (collectively, 2024 guidelines). First, FAA issued revised Advisory Circular 136-4, which described one (but not necessarily the only) "means" by which commercial aircraft operators would be authorized to fly below 1,500 feet in this area with an FAA-issued operations specification. That advisory circular provided that operators

to whom the operations specification is issued may fly below 1,500 feet to avoid unforeseen weather events, then return to 1,500 feet for the remainder of the flight. Second, FAA issued a notice announcing that it would "archive" (or retire) the operators' old authorizations in six months, and third, FAA updated FAA Order 8900 to reflect these changes.

Petitioners, a group of helicopter tour operators and an industry association, want to be able to fly below 1,500 feet in scenarios other than those authorized by the operations specification. Petitioners have pending requests with FAA to retain the operations specification that does not incorporate the 2024 guidelines. But rather than wait for FAA's decision on whether additional or differing mitigations might be allowed for their operations and what those alternate mitigations might be, petitioners challenged the advisory circular in this Court, and— three months after FAA announced that it would archive current authorizations—sought a stay pending review in this Court.

As explained below, that stay request should be denied for multiple reasons. The government does not, however, object to expedited briefing in this case.

## STATEMENT

**1.** Congress has charged FAA with broad authority to set "minimum safety standards" for air carriers for whom certificates are issued. *See* 49 U.S.C. §§ 40103(b)(1), (2), 44701(b), 44702. Pursuant to these authorities, FAA issues certificates to qualifying persons and entities to participate in commercial aviation and sets safety standards to comply with those certificates to fly. *See* 14 C.F.R. pts. 119, 121, 135, 136. FAA also issues additional requirements and authorizations on a carrier-by-carrier basis by approving those carriers' operations specifications (commonly referred to as "OpSpec ¶ B048" for Hawaii tour operators). *See* 14 C.F.R. § 119.49.

Because of the unique conditions in Hawaii, FAA set additional regulatory requirements generally restricting aircraft operators from flying below 1,500 feet, beginning in 1994 and extending to the present-day. *See* Air Tour Operators in the State of Hawaii, 59 Fed. Reg. 49138-01 (Sept. 26, 1994); 14 C.F.R. § 136.75(d)(1). The current regulation provides for exceptions to that restriction only "when necessary for takeoff and landing, or operating in compliance with an air traffic control clearance, or as otherwise authorized by the Administrator." 14

C.F.R. § 136.75(d). Tour operators, like petitioners, who wish to conduct their tours in Hawaii under 1,500 feet may seek authorization to do pursuant to one of two different procedures.

First, Hawaii tour operators may be authorized to deviate through issuance of "OpSpec ¶ B048" with FAA approval. *See* FAA Decl. ¶ 26.[1] As described further *infra* pp. 5, 7-8, such approvals may be based on guidance provided by FAA through advisory circulars and other such guidelines setting out situations in which FAA believes that such deviations will be sufficiently safe. Either a tour operator or the FAA may propose an amendment to a previously approved OpSpec ¶ B048, including through amendment of associated operating manuals and procedures therein. *See* 14 C.F.R. § 119.51. If FAA initiates the amendment, the agency must provide the affected operator the opportunity to object and to move for reconsideration if the operator is unhappy with FAA's initial resolution of their objection. *Id.* § 119.51(b),

---

[1] In order to rebut assertions made by petitioners in their stay application, as well as provide additional insight into the issuance of the guidelines at issue in this litigation and the ongoing agency proceedings, the government has attached a declaration from the manager of the AFS-200 Air Transportation Division within the FAA's Flight Standards Service, Office of Safety Standards, who is familiar with these matters.

(d). That process results in a final determination as to whether an operator's OpSpec ¶ B048 will be amended.

Second, under 14 C.F.R. Part 11, a tour operator may seek a carrier-specific exemption "from the requirements of a current regulation," including ones governing required flight altitude. *See* 14 C.F.R. §§ 11.15, 11.61(b). When seeking an exemption, a tour operator must demonstrate that the exemption "would not adversely affect safety" or "would provide a level of safety at least equal to that provided by the rule from which" the exemption is sought and would be in the public interest. *Id.* § 11.81.

**2.** At issue here are changes to FAA guidelines about the conditions in which deviations from 1,500 feet are generally considered safe.

In 2008, FAA provided public notice that tour operators could fly below 1,500 feet in certain geographic areas and in accordance with the Hawaii Air Tour Common Procedures Manual (2008 guidelines). The FAA included this condition in their OpSpec ¶ B048s. FAA Decl. ¶ 6.

Unfortunately, a "concerning number of air tour accidents," including the "doubling of accidents" leading to thirteen fatalities

between 2017 and 2024 caused the FAA to consider imposing additional safety measures. FAA Decl. ¶¶ 2-3, 7-11. FAA therefore asked for public comment about issuing an advisory circular that would revise the guidelines concerning when Hawaii tour operators may fly below 1,500 feet. As relevant here, the primary objection to the revisions voiced by commenters was that limiting flights below 1,500 feet would compress air traffic.

In light of the accident record and after reviewing the comments, FAA concluded that the 2008 guidelines should be revised "to prevent further accidents and loss of life." *See* FAA Decl. ¶¶ 2-3, 11-25; *see also, e.g.*, FAA Ex. 1 (OPR Disposition Column), FAA250-51, 342-43.[2] FAA found that the concerns about air traffic would be mitigated if operators "establish[ed] routes" that stagger[ed] altitudes and flight paths," used "airspace management practices" and "communication protocols," and updated their aircraft and pilot training as necessary. FAA Decl. ¶¶14, 21; *see also, e.g.*, FAA Ex. 1 (OPR Disposition Column), FAA225-27, 239-

---

[2] All references to FAA Bates Stamped pages are to excerpts from FAA's Clearance Record: Document Comment Log, which is part of the underlying administrative record. The government has provided those excerpts as FAA Ex. 1.

43, 245-46, 250-52, 255-59, 275-77, 283-84, 287, 291-93, 297-300.

Additionally, as explained in the FAA declaration, there is a "safety buffer" created by "the significant vertical separation between helicopter operations at 1500 feet AGL and the typical operational altitudes of other traffic" in this area. FAA Decl. ¶15. FAA found that these potential hazards could be best mitigated "through other means, such as the through implementation of Enhanced Safety Protocols," including "[c]onduct[ing] comprehensive pre-flight briefings," "[i]mplement[ing] monitoring and reporting systems," and "[d]evelop[ing] and implement training programs." *Id.* ¶21.

On November 12, 2024, FAA issued revised Advisory Circular 136-4, which described "an acceptable means, but not the only means, for" tour operators to obtain an approved OpSpec ¶ B048 with authority to fly below 1,500 feet in certain circumstances. Advisory Circular 136-4, Cover Letter (Pet. Ex. 1). Specifically, this circular permits deviations in response to unforeseen weather conditions. In so doing, the circular left in place pilots' regulatory authorization to also do so "when necessary for takeoff and landing, or operating in compliance with an air traffic control clearance,"14 C.F.R. § 136.75(d), or to avoid other emergencies,

14 C.F.R. § 91.3. The circular also provided information that operators could use to update their operating plans, to revise pilot training, and to update flight equipment to better mitigate risks association with unforeseen weather conditions. *See* Advisory Circular 136-4, chs. 4-6 (Pet. Ex. 1). FAA also issued a notice announcing that it would "archive" (or retire) the operators' old OpSpec ¶ B048s in six months, and FAA updated Order 8900 to reflect these changes.

**3.** Consistent with these guidelines and the regulatory process in 14 C.F.R. § 119.51, FAA sent notices to Hawaii tour operators explaining the agency's intent to amend existing OpSpec ¶ B048s, unless operators submitted objections. Twelve operators timely objected. FAA Decl. ¶30. After reviewing these objections, FAA informed the operators on March 3, 2025, that it was planning to proceed with the proposed amendment as of May 11, 2025, unless the operators petitioned for reconsideration within thirty days. *Id.* FAA is also working with these operators to implement FAA's suggested revisions to the operators' proposed manuals submitted as part of this same process. FAA Decl. ¶33.

**4.** On January 10, 2025, several Hawaii helicopter tour operators and a trade association, which would prefer for tour operators to fly at low altitudes under expanded conditions, filed a petition challenging the 2024 guidelines.[3] Approximately six weeks later, petitioners requested that this Court stay the effective date of the retirement of their OpSpec ¶ B048. Petitioners did not seek a stay from the agency prior to filing their motion. Mot. 15 n.11.

## ARGUMENT

Petitioners' motion should be denied because petitioners failed to first seek a stay from the agency, as required by Federal Rule of Appellate Procedure 18. Moreover, petitioners have failed to satisfy any of the factors necessary to justify the issuance of the extraordinary relief they seek: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the

---

[3] Petitioners consist of a trade association (Vertical Aviation International, Inc.), and a subset of helicopter tour operators (Airborne Aviation, Inc. d/b/a Magnum Helicopters; Alex Air, Inc. d/b/a Maverick Helicopters; Aloha Helicopter Tours LLC d/b/a Ali'i Air Tours and Charters, Aris, Inc. d/b/a Air Maui Helicopter Tours; Hawaii Pacific Aviation, Inc., d/b/a Mauna Loa Helicopters; Island Helicopters Kauai, Inc.; Jack Harter Helicopters, Inc.; Novictor Aviation LLC d/b/a Rainbow Helicopters; and Safari Aviation, Inc., d/b/a Safari Helicopters).

applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation marks omitted).

## I. The motion is procedurally improper.

Petitioners' stay motion is procedurally barred because petitioners failed to "move first before the agency for a stay pending review." Fed. R. App. P. 18(a)(1); *see also* 49 U.S.C. § 46110(d) (requiring petitioners to raise objections before the agency). Because "[t]he filing of an administrative petition for stay is a prerequisite to filing a judicial petition," *Environmental Def. Fund, Inc. v. EPA*, 716 F.2d 915, 921 n.10 (D.C. Cir. 1983), the stay motion can be denied on procedural grounds alone.

In a footnote, petitioners attempt to invoke an exception for cases in which "moving first before the agency would be impracticable." Fed. R. App. P. 18(a)(2)(A)(i). Petitioners assert that seeking a stay from FAA would have been futile "because FAA has already given notice to each Hawaii air tour operator of its intent to archive the operators' existing OpSpec ¶ B048." Mot. 15 n.11.

As an initial matter, the mere fact that the agency has indicated its intention to take certain actions is insufficient to show impracticability; were that the case, the exception would swallow the rule. As this Court has observed, "[p]rior recourse to the initial decisionmaker would hardly be required as a general matter if it could properly grant interim relief only on a prediction that it has rendered an erroneous decision." *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).

Moreover, petitioners' argument is particularly misplaced here because the November 20 notice is the first step in a prescribed regulatory procedure that affords operators the opportunity to object to the proposed change to their operations specifications. *See* 14 C.F.R. § 119.51. If an operator is not satisfied with FAA's response to that objection, it may lodge a petition for reconsideration, which "suspends the effectiveness of any amendment issued by the responsible Flight Standards office unless the responsible Flight Standards office has found . . . that an emergency exists requiring immediate action with respect to safety in air transportation or air commerce." *Id.*

§ 119.51(d)(3). It was therefore certainly not futile to seek a stay before the agency.

## II.    Petitioners are unlikely to prevail on the merits.

Even were it procedurally proper, the stay motion should be denied because petitioners are unlikely to succeed on the merits. *See Nken*, 556 U.S. at 434. As an initial matter, the 2024 guidelines are not final agency action subject to review at this time, and even if they were, the agency complied with relevant procedural requirements and engaged in reasoned decisionmaking.

### A.    The challenged actions do not constitute final agency action.

As this Court has long recognized, "[i]n a licensing proceeding, it is the order granting or denying the license that is ordinarily the final order." *City of Benton v. Nuclear Regulatory Comm'n*, 136 F.3d 824, 825 (D.C. Cir. 1998). In this context, the relevant "license" is the OpSpec-B048. *See supra* pp. 4-5. That OpSpec-B048 is issued and amended pursuant to FAA's Part 119 procedures.

The advisory circular itself did not issue or revoke any authorization. It simply set forth FAA's non-exhaustive view of when flights below 1,500 feet would be permitted. *See Hudson v. FAA*, 192

12

F.3d 1031, 1034-35 (D.C. Cir. 1999) (explaining that an advisory circular did not constrain FAA's ability to take a different approach in a certificate). Indeed, the circular disclaims any authority to alter any authorization. The circular emphasizes: "The contents of this document do not have the force and effect of law and are not meant to bind the public in any way." Advisory Circular 136-4, Cover Letter (Pet. Ex. 1). Instead, the circular "describes *an* acceptable means, but *not the only means*" for tour operators "to obtain the authorization given through OpSpec[]-B048" to conduct their tours. *Id.* (emphasis added). The advisory circular here is thus utterly unlike the one in *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007) (cited by Mot. 12 n.9), which this Court determined had immediate effect.

FAA began the process of amending petitioners' OpSpec-B048s on November 20, 2024. It sent petitioners individual letters notifying them of the agency's intention to amend their existing OpSpec-B048s consistent with potential operations described in the advisory circular, unless petitioners objected. *See, e.g.*, Mot. to Stay, Riemer Ex. 1. On March 3, 2025, FAA informed the twelve operators that had filed timely objections that the agency was planning to proceed with the proposed

amendment effective on May 11, 2025, unless the operators sought administrative reconsideration within thirty days. *See* FAA Decl. ¶30. If the operators file for consideration, FAA may decide to withdraw all (or a portion of) the proposed amendment. *See* 14 C.F.R. § 119.51(b), (d). Should petitioners obtain the relief they seek in those administrative proceedings, it would obviate the need for judicial review of FAA's 2024 guidance documents, which is a "good sign that" these documents are "not final." *See, e.g.*, *CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 30 (D.C. Cir. 2014). And if petitioners remain dissatisfied, they can seek judicial review of the final decisions regarding their OpSpec ¶ B048. What petitioners cannot do is short-circuit that process by challenging non-final agency actions in the meantime.

## B. FAA's actions were consistent with any applicable APA requirements.

**1.** Petitioners fare no better in arguing that FAA had to issue the advisory circular pursuant to notice-and-comment rulemaking. *See* Mot. 16-18. As this Court has long acknowledged:

> [N]o statute requires the FAA to engage in the notice and comment process or hold proceedings on the record when issuing advisory circulars. Instead, advisory circulars fall into the vast category of "informal adjudications" in which agencies routinely engage.

*Safe Extensions*, 509 F.3d at 604; *see also Avia Dynamics, Inc. v. FAA,* 641 F.3d 515, 521 (D.C. Cir. 2011) (summarizing this portion of *Safe Extensions*). The advisory circular at issue here makes clear that it "do[es] not have the force and effect of law and [is] not meant to bind the public in any way" but rather, describes "an acceptable means, but not the only means," for tour operators "to obtain the authorization given through OpSpec[]-B048." *See* Advisory Circular 136-4, Cover Letter (Pet. Ex. 1).

The subsequent procedural history bears out that the advisory circular does not bind anyone at this point. *See supra* p. 8. Indeed, the twelve operators who objected to a proposed amendment to their OpSpec-B048s may seek reconsideration of FAA's March 3 response to those objections. FAA Decl. ¶30. As part of that process, operators may propose an "alternate but equivalent means of compliance to that provided in the Advisory Circular." *Id.* ¶32. Alternatively, as one operator has done, petitioners could seek to do so through an exemption under Part 11. *Id.* ¶¶34-36.

Despite relying on *Safe Extensions* elsewhere (Mot.12 n.9), petitioners fail to acknowledge this binding precedent. Petitioners

instead fundamentally misconstrue the "mandatory" language in the advisory circular. *See* Mot. 17. That language as to what air tour operators "must" do in terms of their operating procedures is what they must do if they want to seek an OpSpec-B048 authorization based on operating specifications that adopt the operations described as sufficiently safe in the advisory circular. But if a tour operator does not want to follow those operating specifications, they remain free to seek authorization based on other proposed operating specifications that FAA finds to be acceptable through the Part 119 amendment process or the Part 11 exemption process.

Petitioners next contend that FAA was required to issue the 2024 advisory circular through full notice-and-comment because FAA published the 2008 guidelines in the Federal Register and the Hawaii tour industry had subsequently operated under those guidelines. Mot. 16-18 (relying on *Southern Cal. Aerial Advertisers' Ass'n v. FAA*, 881 F.2d 672 (9th Cir. 1989); *San Diego Air Sports Ctr., Inc. v. FAA*, 887 F.2d 966 (9th Cir. 1989)). But those two out-of-circuit cases provide no basis for setting aside this Court's longstanding precedent that advisory circulars are not legislative rules that require notice-and-comment. And

even taken on their terms, the two Ninth Circuit cases are distinguishable because they were predicated on the idea that those particular agency decisions had an immediate effect, in contrast to the advisory circular here, which does not for the reasons described above. *Compare Southern Cal. Aerial Advertisers' Ass'n*, 881 F.2d at 676 & n.5, and *San Diego Air Sports Ctr., Inc.*, 887 F.2d at 968, *with supra* pp. 12-14.

That FAA happened to seek public comment on the 2008 guidelines in a Federal Register notice does not alter the analysis. The 2008 guidelines—like the 2024 guidelines—are not subject to notice-and-comment rulemaking under this Court's precedents. As a result, FAA's departure from the 2008 guidelines also does not require notice and comment. *See Flytenow, Inc. v. FAA*, 808 F.3d 882, 889 (D.C. Cir. 2015). In any event, it bears noting that FAA provided an analogous opportunity for the public to comment on this interpretative adjudication through its website and considered those comments before providing the public with the final circular on that website.

**2.** FAA likewise engaged in reasoned decision-making in concluding that, on balance, it would no longer support a blanket policy

statement that flights below 1,500 feet were permissible in certain areas, except where necessary for unforeseen weather conditions or other emergencies. *See* FAA Decl. ¶¶ 2-3, 7-11, 24-25. FAA reached this conclusion after careful consideration of the potential safety implications, as confirmed by the comment log in the administrative record and the additional background provided by the attached declaration.

FAA relied on the unacceptable number of air tour accidents that the 2008 guidelines had failed to prevent. And FAA reasonably concluded that this "clear evidence," *see* FAA Decl. ¶11, was not outweighed by petitioners' speculation. FAA determined that "potential compression of traffic and/or airspace conflicts between helicopter air tour operations at 1500 feet AGL and other aircraft" would be mitigated if operators "establish[ed] routes" that stagger[ed] altitudes and flight paths," used "airspace management practices" and "communication protocols," and updated their aircraft as necessary. FAA Decl. ¶ 14; *see also, e.g.*, FAA Ex. 1 (OPR Disposition Column), FAA225-27, 239-43, 245-46, 250-52, 255-59, 275-77, 283-84, 287, 291-93, 297-300. Moreover, as FAA's declaration explains, there will be a "safety buffer" through

"the significant vertical separation between helicopter operations at 1500 feet AGL and the typical operational altitudes of other traffic" in this area, which is "further supported by stringent Air Traffic Control (ATC) guidance," "advanced communication and navigation technologies," and the "distinct operational characteristics of helicopters and other traffic." FAA Decl. ¶15-19. Finally, the 2024 guidelines provide for deviations for unforeseen weather events, in addition to other emergency situations.

The other safety concerns raised in the motion based on speculation about pilot behavior are similarly unpersuasive. There is no empirical evidence for the counterintuitive argument that additional pilot training increases, rather than decreases, risk. *Compare* Mot. 10, *with* FAA Decl. ¶ 23. Petitioners' bald assertion that pilots will refuse to "deviat[e] from weather when otherwise called for, out of fear for the more rigid requirements" if their OpSpec ¶ B048s are amended (Mot. 10) is similarly farfetched. Doing so would contravene the pilot's own safety and that of their passengers, as reflected in pilots' obligations under the regulations to deviate from the regulations (including the 1,500 regulation) where necessary for safety and the advisory circular's

express instructions that pilots may deviate for unforeseen weather conditions. *See* FAA Decl. ¶22, *see also* 14 C.F.R. § 91.3(b).

To the extent the cases on which petitioners rely suggest that FAA had to provide the public with a document detailing FAA's reasoning in evaluating the comments (Mot. 19), that contention is incorrect where, as here, notice-and-comment rulemaking was not required. *See Safe Extensions, Inc.*, 509 F.3d at 604. And there is no question that FAA's resolution of these competing concerns is a factual judgment call that falls squarely within its authority.

### III. The other equitable factors weigh against a stay pending appeal.

#### A. Petitioners fail to demonstrate irreparable harm.

Petitioners fail to demonstrate irreparable harm absent a stay, which is an independently sufficient ground to deny the motion. *See KalshiEX LLC v. Commodity Futures Trading Comm'n*, 119 F.4th 58, 64 (D.C. Cir. 2024) ("[A] showing of irreparable harm is a necessary prerequisite for a stay.").

Petitioners rely solely on purported economic harms, ranging from lost business to the additional costs of communicating with FAA as to how to update their manuals consistent with the advisory circular,

adjusting pilot training, and updating their helicopters with additional

equipment. *See* Mot. 21-23. Rather than break out those costs, they

lump them together to provide broad estimates of projected lost income.

*Id.*

As an initial matter, these contentions are plainly insufficient as

to certain aspects of claimed harms, specifically, the potential alteration

of petitioners' operations, such as staff time working on updating

operations manuals or providing additional pilot training. They have

not quantified those expenses, much less demonstrated why

participating in these routine tasks in a regulated industry would

upend their business models. In any event, petitioners have not shown

that they will, in fact, have to take these measures in light of the

potential to seek alternative means of maintaining their authorizations,

including through the Part 119 amendment process and the individual

exemption process. *See* FAA Decl. ¶¶ 26-36. *Cf. Wisconsin Gas Co. v.

FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (requiring that litigants show

that their economic loss would be "certain and great").

Moreover, petitioners' delay in seeking a stay further undermines

their assertion of irreparable harm. *Cf. Gordon v. Holder*, 632 F.3d 722,

725 (D.C. Cir. 2011) (discussing cases demonstrating "that untimely filings may support a conclusion that the plaintiff cannot satisfy the irreparable harm prong"). Petitioners waited almost two months to file a petition for review of the November 2024 guidance, and then almost another six weeks before filing a motion for a stay. In the interim, petitioners failed to request a stay from the agency. That lack of diligence indicates that petitioners do not stand to suffer irreparable harm. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (per curiam).

### B.    The public interest weighs against a stay.

Granting the requested stay would harm the government and the public interest. *See Nken*, 556 U.S. at 435 ("These factors merge when the Government is the opposing party."). To the extent that a stay would stymy FAA's current actions to adopt amendments to the tour operators' OpSpecs-B048, it would create a significant risk of aviation accidents.

As described *supra* pp. 5-7, FAA found that the 2008 guidelines failed to prevent "a concerning number of air tour accidents" in Hawaii between 2010 and 2024. FAA Decl. ¶7. Those accidents "doubl[ed]"

between 2017 and 2024, including three accidents that caused thirteen fatalities. *Id.* ¶8. And the National Transportation Safety Board cited "environmental factors such as weather and terrain" in more than half of the more recent accidents. *Id.* ¶9. "These data underscore the necessity for stringent safety measures, including the revised minimum altitude requirement to mitigate risks associated with low-altitude flight and challenging environmental conditions." *Id.* ¶11.

In order to permit the industry more time to think about how to safely update their operations, FAA provided six months until amendment of OpSpec-B048 was required. FAA Decl. ¶24. A stay beyond May 11, nonetheless, "presents an unacceptable risk, as evidenced by the accident history described above." FAA Decl. ¶ 25. "This risk could result in significant issues, including more accidents and loss of life during the busy summer tourist season in Hawaii." *Id.* These safety risks weigh heavily against a stay.

### C.    If the Court grants a stay, it should tailor the stay.

If this Court were to grant a stay, however, any such stay should only be granted, at most, to the three operators—Rainbow Helicopters, Maverick Helicopters, and Jack Harter Helicopters, Inc. —that

submitted declarations asserting irreparable harm if they are ultimately required to update their operations to align with the advisory circular. By failing to submit similar declarations, the other petitioners have failed to meet their burden to demonstrate irreparable harm. And as to these three operators, any such stay should also clarify that the operators must continue to participate in good faith in the ongoing agency proceedings that would provide alternate means of ensuring that they will have operations specifications consistent with air safety once this Court issues a decision. Petitioners have failed to show any irreparable injury in communicating with FAA about updates to their manuals, participating in the Part 119 amendment process, or seeking a different exemption.

## IV. The government would agree to an expedited briefing schedule.

In light of the importance of these issues, the government would instead agree to expedited consideration of this case with a schedule that would enable the Court to resolve this case as soon as practicable.

The government therefore proposes the following schedule:

- **Certified Index to the Record:** Previously filed on February 24, 2025;

- **Petitioner's Opening Brief:** March 26, 2025 (30 days after certified index was filed);

- **Respondent's Brief:** April 16, 2025 (21 days after petitioner's brief);

- **Petitioner's Reply Brief:** April 30, 2025 (14 days after respondent's brief).

The government believes this schedule will permit the prompt and orderly resolution of the petition, including allowing oral argument to be scheduled during this Term (should the Court choose to hear argument).

## CONCLUSION

For the foregoing reasons, this Court should deny petitioners' motion to stay the 2024 guidelines pending review in this Court.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney
   General*

ABBY C. WRIGHT
 */s/ Caroline D. Lopez*
CAROLINE D. LOPEZ
   *Attorneys, Appellate Staff
   Civil Division, Room 7524
   U.S. Department of Justice
   950 Pennsylvania Avenue NW
   Washington, DC 20530
   (202) 514-4825
   caroline.d.lopez@usdoj.gov*

February 2025

**CERTIFICATE OF COMPLIANCE**

This response to a motion complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2) because it contains 4,684 words. This response also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Caroline D. Lopez*
Caroline D. Lopez

## CERTIFICATE OF SERVICE

I hereby certify that on March 3, 2025, I electronically filed the foregoing response to a motion with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system

*/s/ Caroline D. Lopez*

Caroline D. Lopez

# FAA Declaration

IN THE UNITED STATES COURT OF APPEALS

FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

)
VERTICAL AVIATION                                )
INTERNATIONAL, INC., ET AL.,                     )
                                                 )
                    Petitioners,                 )
                                                 )
            v.                                   )        No. 25-1017
                                                 )
FEDERAL AVIATION ADMINISTRATION,                 )
                                                 )
                    Respondent.                  )
_____         )


**DECLARATION OF ROBERT H. RECKERT**


I, ROBERT H. RECKERT, pursuant to 28 U.S.C. § 1746 and based upon my personal knowledge, as well as documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1. I am the manager of the AFS-200 Air Transportation Division within the Federal Aviation Administration's (FAA) Flight Standards Service, Office of Safety Standards (AFS). I have held this position since July 17, 2022. The Air Transportation Division is responsible for regulations and policy recommendations governing certification and operations aspects of air carriers and commercial operators, including commercial air tours subject to Title 14 of the Code of Federal Regulations (14 CFR) Part 136. This includes commercial air tours conducted in the State of Hawaii. As part of these duties and responsibilities, the Air Transportation Division drafted and published, in accordance with FAA procedures for publication of such documents, Advisory Circular 136-4, OpSpec/LOA B048, and associated internal guidance in FAA Order 8900.1.

<u>Hawaii Airspace History</u>

2. The unique landscape and cultural significance of Hawaii make it a popular destination for helicopter air tours. However, these tours have led to several accidents, including fatalities, prompting the FAA to phase out use of the prior deviation authority for operations below the set minimum altitude and to offer a new means of compliance to receive authorization to operate below 1500 feet above the surface in the state of Hawaii.

3. This new means of compliance and associated guidelines are necessary to ensure the requisite safety of these helicopter air tours for the benefit of the industry and traveling public. Leaving inadequate risk controls in place would maintain the likelihood of additional accidents at an unacceptable level. The revised guidelines offer several benefits, including enhanced safety, standardization, and protection of passengers while experiencing and enjoying Hawaii's natural and cultural significance.

4. The 1500-foot minimum altitude requirement in Hawaii originated in Special Federal Aviation Regulation (SFAR) 71 in 1994[1] due to substantial air tour industry accidents in the preceding decade, including many fatalities. The requirement was later incorporated into 14 CFR Part 136. FAA authority for these actions includes:
    - 49 CFR 40103(b)(1): Grants the Administrator the authority to develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft.
    - 49 CFR 40103(b)(2): Authorizes the Administrator to prescribe air traffic regulations on the flight of aircraft, including regulations on safe altitudes for navigating, protecting, and identifying aircraft; protecting individuals and property on the ground; using the navigable airspace efficiently; and preventing collisions between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

5. To provide latitude for certain operational needs, § 136.75(d) permits operations below 1500 feet for takeoff and landing, in compliance with air traffic control instructions, or as otherwise authorized by the Administrator. Aside from these circumstances or an in-flight emergency, without a deviation or exemption as discussed further in this Declaration, no Hawaii air tour operations are permitted below an altitude of 1,500 feet above the surface over all areas of the State of Hawaii per § 136.75(d).

6. Prior to this most recent revision to guidelines, operations below 1500 were authorized as long as they were conducted in accordance with the Hawaii Air Tour Common Procedures Manual (HATCPM), which permitted operation at lower altitudes in certain areas and in accordance with a corresponding operations specification (OpSpec) issued to certificate holders leveraging the authorization.

---

[1] Air Tour Operators in the State of Hawaii, 59 FR 49138-01, September 26, 1994.

7. Despite the intent to balance economic and operational needs with safety, air tour operators in Hawaii were unable to operate safely.  From 2010 to 2024 Hawaii witnessed a concerning number of air tour accidents; here are the relevant data from that period:
   Total Accidents: 22 overall (21 helicopters, 1 airplane)
   Injury Levels:
   - Fatal: 19 occupants (20%)
   - Serious: 17 occupants (18%)
   - Minor: 13 occupants (14%)
   - None: 45 occupants (48%)

8. From 2010-2017 (8 years), there were 6 overall accidents, 2 of which resulted in a total of 6 fatalities.  From 2017-2024 (7 years) there were 16 overall accidents, 3 of which resulted in a total of 13 fatalities.  This doubling of accidents and fatalities occurred despite the substantial reduction in tourism and air tour operations that occurred because of the COVID-19 Public Health Emergency.

9. The National Transportation Safety Board (NTSB), who investigates aviation accidents, assigns multiple findings to each investigated accident.  In accidents from 2010 to 2024, environmental factors such as weather and terrain were cited in 7 accidents.

10. The NTSB has also issued numerous Safety Recommendations to the FAA, many of which were incorporated directly into the updated guidelines for this authorization.  Failure to implement these guidelines will delay needed safety improvements as strongly recommended by the NTSB.

11. This record is clear evidence that existing risk mitigations were ineffective and required correction to prevent further accidents and loss of life.  These data underscore the necessity for stringent safety measures, including the revised minimum altitude requirement to mitigate risks associated with low-altitude flight and challenging environmental conditions.

2024 Advisory Circular 136-4 Guidelines

12. The new guidelines to obtain the updated OpSpec, set forth in Advisory Circular 136-4, only permits operations below 1,500 feet to avoid operations in clouds. The guidelines set forth in the Advisory Circular are one means, but not the only means to obtain authorization to operate below 1,500 feet, as described further in this Declaration.

13. Air carriers and representative industry groups have raised concerns regarding potential compression of traffic and/or airspace conflicts between helicopter air tour operations at 1500 feet AGL and other aircraft.  Given the increasing density of air traffic and the recent tragic mid-air collision in Washington, DC, these concerns are understandable; however, in response to the claim that these changes will compress aircraft into a single altitude or route, the FAA disagrees.

14. The minimum altitude specified by § 136.75(d) (i.e., 1,500 feet above the surface) does not preclude air tour operators from establishing routes and altitudes that are above this minimum altitude to stagger altitudes and flight paths, therefore mitigating the possibility

of compressed traffic.  In fact, a thorough analysis of established aviation regulations[2], airspace management practices[3], operational characteristics of these aircraft types, and communication protocols[4] [5] clearly demonstrates that helicopters operating at 1500 feet AGL do not pose a significant risk of interference with other traffic.

15. The primary safety buffer is the significant vertical separation between helicopter operations at 1500 feet AGL and the typical operational altitudes of other traffic, especially airline traffic which is much higher. Additionally, the structured and managed airspace design ensures that helicopters operate in areas with minimal interaction with airline traffic. This separation is further supported by Air Traffic Control (ATC) guidance, advanced communication and navigation technologies, and distinct operational characteristics of helicopters and other traffic, especially airlines.

16.  Both aircraft types are equipped with two-way radios for communication with ATC and, when necessary, with each other. This enables proactive coordination and conflict resolution should any unforeseen situation arise.  Most helicopters, particularly those operating in or near controlled airspace, are equipped with transponders that broadcast their position and altitude to ATC radar. This allows ATC to monitor all air traffic, including helicopters, and ensure separation. While not always mandatory for operations in truly uncontrolled airspace, many helicopter operators utilize transponders for enhanced safety and situational awareness.  Both airplanes and helicopters benefit from advanced GPS navigation systems and sophisticated avionics that enhance positional accuracy and situational awareness. This technology further supports safe and predictable flight operations, minimizing the potential for unintended airspace incursions.

17.  Helicopters are designed for low-speed flight, hovering, and vertical takeoff and landing (VTOL) capabilities. They are highly maneuverable at lower altitudes. Airlines, in contrast, operate at high speeds and rely on forward momentum for lift, requiring runways for takeoff and landing. These distinct performance characteristics inherently segregate their operational environments. Airline and corporate airplanes are focused on scheduled, point-to-point transportation of passengers and cargo over long distances. Helicopter missions, as previously mentioned, are diverse, often localized, and require low-altitude maneuverability for specialized tasks. These fundamentally different mission profiles lead to operational separation in both time and space.

18.  Airline and corporate airplanes traffic predominantly operates within controlled airspace, where ATC provides active surveillance, separation services, and guidance. This includes Class A, B, C, and D airspace. Helicopters operating at 1500 feet AGL, particularly outside of immediate airport terminal areas, often operate in the lowest altitudes within

---

[2] 14 CFR 91.111, 91.113, 91.123, 91.126-.131, 91.155
[3] Federal Aviation Administration, Joint Order (JO) 7110.65, as amended, available from https://www.faa.gov/regulations_policies/orders_notices/index.cfm/go/document.current/documentnumber/7110.65
[4] Federal Aviation Administration, Aeronautical Information Manual, Ch. 4 and 5 (2025), available from https://www.faa.gov/air_traffic/publications/atpubs/aim_html/index.html
[5] Federal Aviation Administration, Pilot/Controller Glossary (2025), available from https://www.faa.gov/air_traffic/publications/atpubs/pcg_html/

Class E controlled airspace. This inherent separation by airspace classification further minimizes interaction.

19. Around airports, where airline traffic is concentrated for arrivals and departures, specific procedures and airspace designations are in place. While helicopters may operate within or near Part 39 Airports, they do so under strict ATC coordination and adherence to established procedures that maintain separation from fixed-wing airline traffic. These procedures include specific approach and departure routes, altitude restrictions, and communication requirements. Crucially, even within terminal areas, the focus is on maintaining safe separation, and helicopter operations are integrated in a way that does not impede airline traffic flow.

20. In addition, concerns have been raised that the FAA ignored hazards identified by industry stakeholders that would be mitigated if operations in accordance with the HATCPM were allowed to continue. In fact, the FAA was and always continues to be open to feedback from industry and gives all reported hazards due consideration. In spring 2024 FAA evaluated the potential hazards proposed by industry after the close of the public comment period but determined that they did not warrant deviation from the regular comment review and publication process for external guidance documents, nor did they warrant a change to the draft Advisory Circular associated with this change in standards. Adherence to the HATCPM as a sole means to receive authorization to operate at lower altitudes has been found to no longer be in the interest of safety or noise abatement.

21. The identified hazards could be best mitigated through means other than the HATCPM, such as air carriers' manual systems, through implementation of Enhanced Safety Protocols. These may include, but are not limited to:
   - Conduct comprehensive pre-flight briefings[6].
   - Implement monitoring and reporting systems[7].
   - Develop and implement training programs[8].
   - Invest in advanced monitoring and reporting systems (ADS-B In/Out)[9]

22. Furthermore, concerns have also been raised that air tour operators will be fearful to deviate for weather conditions. OpSpec B044 authorizes deviation from unforecasted weather without exercising emergency authority. FAA regulations explicitly state that pilots are permitted to deviate from regulations, as necessary, to maintain safety in emergency situations.[10] The expectation is that pilots will always prioritize safety and exercise sound judgment when navigating in challenging conditions. Additionally, existing regulations such as maintaining specific cloud clearances ensure that pilots operate within safe parameters.[11] The guidelines in the updated Advisory Circular serve as a reminder that the primary responsibility of pilots is to maintain the safety of the aircraft and its occupants by making necessary adjustments based on real-time weather assessments.

---

[6] Federal Aviation Administration, Advisory Circular No. 136-4, Para. 6.8.1 (2024)
[7] Federal Aviation Administration, Advisory Circular No. 136-4, Para. 4.2-4.2.3 (2024)
[8] Federal Aviation Administration, Advisory Circular No. 136-4, Ch. 6 (2024)
[9] Federal Aviation Administration, Advisory Circular No. 136-4, Ch. 5 (2024)
[10] 14 CFR § 91.3(b)
[11] 14 CFR 91.155; 14 CFR 135.205

23. Contrary to the assertion that increased pilot training could be detrimental, properly trained pilots equipped with appropriate instruments significantly mitigate the risk of loss of control in instrument meteorological conditions (IMC). The notion that additional training may introduce risks lacks empirical support and is not aligned with the FAA's commitment to continuous improvement in aviation safety. Properly trained pilots with the correct equipment are far better prepared to handle unexpected situations, thereby enhancing overall safety during helicopter air tours in Hawaii. The FAA's emphasis on training is to ensure that pilots are equipped to avoid inadvertent encounters with IMC and manage such scenarios effectively if they arise.

24. The FAA originally set the implementation date for May 11 to provide affected air carriers with six months from the date of publication of the new guidelines to make the necessary changes. This time is more than adequate, especially given prior industry awareness of pending changes following their opportunity to review and comment on the draft Advisory Circular in Fall 2023 as well as the ability to discuss the impact on their specific operation through the 14 CFR § 119.51 operations specification amendment process.

25. Delaying the stay of action beyond May 11 presents an unacceptable risk, as evidenced by the accident history described above. This risk could result in significant issues, including more accidents and loss of life during the busy summer tourist season in Hawaii. Also, air carriers face operational disruptions and challenges due to uncertainty about when they must begin adhering to the new guidelines or lack of adequate preparation time or both.

Part 119 Amendment Procedure and Part 11 Exemption Procedure

26. Air tour operators seeking recourse to address concerns about the guidelines or compliance deadline have multiple options available: input for consideration, plus appeal rights, in accordance with the Nonemergency Administrator-Initiated OpSpec amendment process in 14 CFR § 119.51; submission of alternative approaches to achieve the safety mitigations described in the new guidelines; and/or petitioning for exemption, in accordance with 14 CFR Part 11, from the regulatory requirements of 14 CFR § 136.75.

27. When the responsible Flight Standards office proposes a non-emergency amendment to a certificate holder's OpSpecs, they notify the certificate holder in writing and explain why the amendment is necessary for air commerce safety and the public interest in accordance with 14 CFR § 119.51(a). The certificate holder then has a minimum of 7 days to submit their written response, which the Flight Standards office will consider before notifying the certificate holder of the amendment's adoption, partial adoption, or withdrawal. If the amendment is adopted (fully or partially), it takes effect no less than 30 days after notification, unless the certificate holder petitions the Executive Director of the Flight Standards Service (AFX-1) for reconsideration within 30 days, which would suspend the amendment's effectiveness until a final decision is made.

28. In cases of Administrator-initiated nonemergency OpSpecs amendments or Administrator denials of certificate holder-requested amendments, the certificate holder has an appeal process available under § 119.51(d). If the certificate holder petitions for reconsideration within the 30-day period, the amendment's effective date is suspended,

unless an emergency exists requiring immediate action with respect to safety in air transportation or air commerce. AFX-1 will then review all relevant information and determine whether the amendment is required. If AFX-1 upholds the amendment, the certificate holder will be notified, and if the amendment is not required, it will be withdrawn. A decision by AFX-1 constitutes a final agency order, which can be appealed to a U.S. court of appeals under 49 U.S.C. § 46110.

29. An administrative stay afforded to the petitioner and the agency under 119.51(d) allows the agency to retain the safety discretion needed over such a stay.When and if the FAA were to determine that immediate action is necessary to ensure safety in air commerce or air transportation, the FAA will employ the emergency amendment process described in 14 CFR § 119.51(e).

30. To date, 10[12]Part 135 and 2[13] Part 91 air tour operators have responded to the Honolulu Combined Safety Assurance Office's written letter proposing to amend their Operations Specification B048 or Letter of Authorization B048 for Part 91 air tour operators. The FAA sent a response to those operators on March 3, 2025 informing them that the proposed amendment to their operations specifications will proceed on May 11, 2025 unless they file a petition for reconsideration with the Executive Director of the Flight Standards Service within 30 days in accordance with 119.51.

31. The FAA notes that Advisory Circular (AC) 136-4, which identifies recommended means of equipping aircraft, incorporating training, and adjusting procedures in order to avoid the possibility of traffic conflicts, is only one method of possible compliance and not a regulatory requirement. Air tour operators have not lost any flexibility in equipping aircraft, training personnel, establishing routes, altitudes, means of traffic collision avoidance, and any other necessary procedures to ensure safe operations during air tours.

32. If affected air tour operators want to jointly create a method to standardize Air Tour Operations in the Hawaiian Islands, based on the new guidelines for issuance of template B048, the FAA fully supports a concerted effort amongst Hawaiian operators to work together to develop standardized procedures for review and approval. These alternate but equivalent means of compliance to that provided in the Advisory Circular can be offered through the section 119.51 process.

33. The 12 air tour operators mentioned in paragraph 30 have submitted manual revisions to the Hawaii Flight Standards in response to the office's written letter proposing to amend their Part 135 OpSpec B048 or Part 91 Letter of Authorization B048. The Honolulu Combined Safety Assurance Office has evaluated the manuals and is actively communicating and collaborating with the air tour operators in identifying discrepancies in

---

[12]Hawaii Pacific Aviation; Novictor Aviation LLC dba Rainbow Helicopters; Airborne Aviation Inc.; Jack Harter Helicopters, Inc.; Helicopter Consultants of Maui, LLC dba Blue Hawaiian; Island Helicopters Kauai, Inc.; K & S Helicopters, Inc.; Aris, Inc. dba Air Maui Helicopter Tours; Alexair, Inc. dba Maverick Helicopters; Safari Aviation, Inc.

[13] Hawaii Pacific Aviation; Aloha Helicopter Tours

the manuals and revisions to it. The Honolulu Combined Safety Assurance Office submitted revisions to all of the 12 air tour operators' manuals on February 14, 2025. The Honolulu Combined Safety Assurance Office is awaiting a response from the air tour operators.

34. An air tour operator may also request relief from 14 CFR § 136.75(d) by petitioning for an exemption in accordance with 14 CFR Part 11. An exemption grants a person or entity relief from an FAA regulation and permits them to conduct operations in accordance with the conditions and limitations of the exemption provided the person or entity meets the requirements in Part 11.

35. To receive an exemption, an air tour operator must provide the necessary information in their petition for an exemption as required in 14 CFR § 11.81. These requirements include, among other things, the person or entity name, mailing address, the specific section of 14 CFR from which the person or entity seeks an exemption, the reasons why granting the request would be in the public interest and reasons why granting the exemption would not adversely affect safety, or how the exemption would provide a level of safety at least equal to that provided by the rule.

36. The FAA will review and analyze the petition for an exemption. If the FAA determines that the request would be in the public interest and the exemption would provide a level of safety equivalent to that provided by the rule, the FAA will issue an exemption. The FAA will notify the petitioner of its decision to grant or deny an exemption in writing. To date one operator, Helicopter Consultants of Maui dba Blue Hawaiian Helicopters, has petitioned for an exemption from 14 CFR § 136.75[14].

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 3, 2025.

ROBERT H RECKERT

Digitally signed by ROBERT H RECKERT
Date: 2025.03.03 15:33:27 -05'00'

Robert H. Reckert
Manager
Air Transportation Division (AFS-200)
Federal Aviation Administration

---

[14] Federal Register FAA-2025-0301

**Exhibit 1**

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | understanding that regardless of weather conditions or location, our pilots will need to fly our tour flights at 1500' AGL or higher at all times except to avoid unforecasted IMC in any location in Hawaii? | | | | 1,500 AGL except when a flight is confronted with unforecast or unreported low ceilings. |
| | Pg i, par 2; Pg 2-1, par 2.2 | If the answer to the above question is "yes", Are the procedures for operations in Known Site Specific Areas and Transition Segments prescribed in the Draft AC to be followed only to descend below 1500' AGL and then, after avoiding the IMC, return to 1500' AGL? | Need clarification | Answer the question in the grid section to the left. | A | Yes, interpretation is correct. The deviation authorization is only for the purpose of flying under unforecast or unreported low ceilings. Further, the air tour must be suspended during the time that the aircraft remains below 1,500 AGL so that the pilot may focus their attention on safely returning to 1,500 AGL. |
| | Pg 1-2, par 1.7.1 | The definition of a Commercial Air Tour Flight Profile is not clear. Please explain the term another way that might be easier to understand. | Need clarification | FAA should explain what a Commercial Air Tour Profile is in clear language. The first sentence of the paragraph is not a complete or understandable sentence. | A | Definition clarified: "…a Commercial Air Tour Flight Profile (CATFP) is the lateral flight path and altitude above ground level that the tour pilot will fly from the departure point to the first KSSA, then via a flight path through a transition area designed to allow for lateral flight path options to avoid IMC, sensitive locations, and repetitive flights over the same lateral path at appropriate altitudes, to the next KSSA in a sequence of KSSAs, and return to departure point." |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| Jack Harter Helicopters, Inc. DCGA136D (JHH) Casey Riemer criemer@jackharterheli.com **Editor's note: Comments received 10/6/23. Per respondent, "This document is supplementary to the comments that JHH submitted August 2023"** | General (Entire Document #1) | From many readings of the Draft AC it is clear that the FAA believes that Air Tour Operators in Hawaii can be granted procedures to operate below 1500' AGL to avoid IMC. The FAA must believe this can be done safely for the authorization to be considered to be Granted by the Administrator of the FAA. If this is a correct statement, why should operation of air tour flights in Hawaii below 1500' AGL only be allowed to avoid IMC? | Air tour flights in Hawaii have been conducted below 1500' AGL for over 60 years. There have been accidents during air tour flights. It is our belief that if a statistical analysis of flight safety were to be conducted, the results would reveal that the rate of air tour accidents in Hawaii is no different that anywhere else in the USA. We also believe that the rate of air tour accidents in Hawaii would be no different than the rate of other commercial flight operations of similar commercial aircraft. | Amend the AC to allow Hawaii air tour operators to fly below 1500' AGL for reasons other than ony to avoid IMC. | R | Operation below 1,500 AGL is authorized only for air tour operators who hold OpSpec/LOA B048 authorization. B048 applicants must provide specific equipment, develop specific procedures, and provide specific training to staff and flight crew members to reduce the risk of an adverse outcome while operating below 1,500 AGL. Those operators who were not issued B048 are not required to invest in the above equipment etc. but must remain in VMC above 1,500 AGL at all times, and are not permitted to conduct VFR on top or over the top operations without appropriate instrumentation and pilot qualifications. Therefore, when faced with IMC they may make lateral deviations around the inclement weather, reverse course and return to the departure point, or if there is no lateral alternative they may descend below 1,500 AGL while declaring an emergency to avoid the IMC conditions and may conduct a pre-cautionary off airport landing if needed. |
| | | Compression of aircraft at the 1500' AGL is going to occur and the level of safety is going to decrease if the only | Unfortunately, these statistical analyses have not been conducted. The FAA does not currently know how | | R | It is likely that many air tour flights will fly at the minimum allowable altitude. This natural tendancy may introduce a greater |

FAA000226

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | reason to fly below 1500' AGL is to avoid IMC. The deviations from the 1500' AGL limit in SFAR71 and the HATCPM were granted to reduce this risk and to allow Hawaiiair tour operators to avoid flying over populated areas. | many air tour and non-tour flights are being flown in the USA under part 91 and 135. Unless the number of flights is known, the rate of accidents cannot be computed. | | | probability of mid-air collision, which in turn may in the future, trigger other mitigations such as requiring operable ADS-B OUT for all aircraft flying within a designated volume of air space frequently occupied by air tour flights, and requiring Air Tour aircraft to be equipped with operable ADS-B IN that provides a Traffic Awareness display and visual and audible warning, (as well as ADS-B OUT). Total activity levels are acquired for all Air Tour flights for which the profile includes flights inside NPS Units. We do not have information about other air tours occuring outside NPS Units. |
| | General (Entire Docume nt #2) | Preface to comments: Our company operates helicopters in Hawaii and has done so since the founder of the company began operations on Kauai in 1962. We operate under a Part 135 (and Part 133) air carrier certificate. For some time, we have pondered why the FAA believes that when a specific type of passenger boards our Part 135 aircraft flown by a Part 135 pilot who is trained and checked under our FAA-Approved Part 135 Training Program, we have to | This comment is to preface and put on the record historical information related to the Hawaii Air Tour insustry. General information | FAA should read this for background information. | R | No response required. |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | Pg 1-3, par 1.7.7 | We operate air tours on Kauai. When the weather permits, the entire island is an area where we "may fly and/or maneuver for the purposes of conducting and air tour." We have no National Parks on Kauai. We can fly anywhere and if our pilots talk about what they are flying over, it is a tour flight. Is this meant to be specific areas where we can fly lower than 1500' AGL? | KSSAs are not clearly defined and does not provide clear directives for operators to follow. | Revise the paragraph with an understanding of the actual operational parameters faced by Hawaii Air Tour Operators. | R | There are many sites or specific areas of interest that the operator could designate as KSSA locations on the flight profile. The entire route of flight along a Commercial Air Tour Flight Profile (CATFP) could conceivably be considered a KSSA. There is no intention of limiting the air tour flight profile to any particular set of locations or routes between ingress / egress points or to and from the departure site or transition areas between KSSAs. The operator may designate their own flight profiles and their own KSSAs. Likewise, there is no area or route along any CATFP where the flight could routinely operate below 1,500 AGL. |
| | Pg 1-4, par 1.7.9 | Given that the entire island over which we operate can be designated as a KSSA, is the transition segment needed? | | | A | That is the operator's choice. However, the air tour must be suspended during any time the aircraft descends below 1,500 AGL in accordance with conditions and limitations associated with OpSpec B048. As long as the flight remains below 1,500 AGL, the pilot's focus must remain solely on safely transiting any area of low ceilings as expeditiously as possible or reversing course to return to conditions that support flight above 1.500 AGL, or executing a precautionary off airport landing. Transition areas are intended to |

FAA000239

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | | | | | provide an infinite number of flight paths laterally across an area between KSSAs as needed to avoid areas of IMC without descending below 1,500 AGL. The authorization to descend below 1,500 AGL is intended to permit the qualified B048 pilot to safely avoid IMC that cannot be avoided by lateral deviations while remaining above 1,500 AGL by descending to a lower altitude (within certain constraints established in the conditions and limitations of the OpSpec/LOA) only to the extent necessary to avoid the area of IMC. However, if the pilot finds a descent deviation below 1,500 AGL is the only viable alternative, the pilot must report the hazardous meteorological condition in accordance with 135.67. This effectively closes the area to further air tour operations until weather conditions moderate. |
| | Pg 1-4, par 1.8 | We do not see the "feedback form". | | Provide a feedback form for review | A | Feedback form will be added prior to publication. |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | Pg 2-1, par 2.2 | There is a need for clarification of this authorization. Is an air tour operator in Hawaii only allowed to fly below 1500' AGL in authorized areas for the purposes of avoiding unforecasted IMC and then they need to return to 1500' AGL? | Safety of flight. | Provide Hawaii air tour operators the abitility to operate below 1500' AGL in areas that are not populated at times when IMC conditions are not present and need to be avoided. | R | No. The minimum altitude of 1,500 AGL is established to improve safety of flight. |
| | | The current B048 opspecs were granted for many reasons. One of them was to avoid the compression of all air tour aircraft at 1500' AGL. There have been many documented and undocumented near mid-air collisions between tour aircraft in Hawaii when there were no deviations from the 1500' AGL limitation in SFAR 71 and there were some in areas where there are still no deviations from the 1500' AGL requirement over populated areas. | | | R | All altitudes above 1,500 AGL are available outside of special use airspace and providing the air tour flight remains 500 feet below any ceiling. |
| | | I am sending two videos along with this comment. One is from a Safari Helicopters' onboard camera system pre-deviation to SFAR71. The Safari AS350 AStar nearly collided with a twin-engine fixed-wing | | | R | No response required. Conclusion is not based on causal relationship between near mid-air collisions and deviations permitted by SFAR 71. The recommendation for applicants to install ADS-B OUT and IN and to train flight crew |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | airplane near Hawaii Island. This video was sent to the FAA and the NTSB. The deviations from the 1500' AGL limits in SFAR71 followed shortly after this event. | | | | members in the use of ADS-B OUT and IN may mitigate risk of mid-air collisions between participating aircraft. Also, bear in mind that all altitudes above 1,500 AGL are available, excepting restricted airspace unless authorized by ATC. |
| | | The second video was from a Sunshine Helicopters' on-board video system. The Sunshine video documents a Airbus EC130s operated by Sunshine and Blue Hawaiian Helicopters coming within feet of each other over the island of Kauai. These two helicopters were flying in an area where the HATCPM dictates they maintain 1500' AGL in the Haena/Lumahai Beach area of Kauai's North Shore. | | | R | |
| | | These videos are used in training events by many helicopter companies in Hawaii. The ability to maintain separation both vertically and horizontally is vitally important and it cannot be stressed enough that "looking out the window" on VFR flights must be stressed at all times. This will be further addressed | | | A | Good advice. |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | in regards to other paragraphs in the Draft AC.<br><br>Editor's note: Jack Harter Helicopters' 10/6/23 email included the two video files mentioned above. | | | | |
| | Pg 2-1, par 2.2.1 | Again the "common" part of the HATCPM must be stressed because of it's importance to safe air tour operations in Hawaii. "Individual applications" for non-common procedures will not provide an equivalent level of safety compared to what is provided by the HATCPM and the current B048 opspecs and the Part 91.147 LOAs. There need to be common manuals developed for each Hawaiian Island. | FAA regulations for all aspects of flight are based on commonality.<br><br>FAA does not have sufficient staffing of operations inspectors to perform additional tasks. | Standardize each island's manuals and procedures. | A | AC text has been revised to emphasize and condone collaboration among air tour providers for the development of common procedures and the adoption of these common procedures by all participating air tour providers. Industry groups often serve to facilitate such actions. Collaborative development of commonly applied procedures will likely streamline approval processes for all participants. |
| | Chapter 3 | Much of this chapter deals with the application for and authorization of OPSPECS/LOAs. In general, the process is fairly straight forward. We need to reiterate the manpower situation at the HNL FSDO and relate that to the process of accepting, reviewing, revising, approving… somewhere near 20 different applications by the limited FSDO POI staff. A | Safety of flight | Increase FAA staffing of HNL FSDO Inspectors | A | Air tour providers are free to discuss with one another, various common procedures that lead to improved and consistent communications, traffic deconfliction, air tour profiles, etc. The result might be that each air tour provider may subscribe to a set of commonly agreed upon procedures that the Inspectors may view with familiarity across the managed certificate holders and LOA holders which reduces the |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | | | | | temperature is recorded on the performance section of a passenger list for each flight. Providing the actual GTOW based on fuel and payload is less than the max allowable GTOW, the flight will remain within performance limits. The record, in the form of a passenger list /performance review, should be retained for as long as the operator normally retains such documents, usually not less than 30 days, |
| | Pg 3-3, par 3.6 | It appears that the HNL FSDO will be given the responsibility/authority to decide if an operator's proposed procedures will be accepted or rejected. How is the decision to authorize an operators proposed procedure(s) going to be made? Is there something in the 8900 manual established for this purpose? | Need for clarification of procedures | Provide an answer. | R | Standards for equippage, training, and documentation of procedures and records are in the text of the OpSpec. The CH or Operator must comply with these minimum standards for the OpSpec to be issued and must be maintained for the OpSpec to remain valid. The Commercial Air Tour Flight Profiles (CATFPs) for each island and each KSSA or groups of KSSAs are influenced by many elements including but not limited to: local weather patterns and terrain, availability of suitable off-airport landing sites, surface congestion / location of noise sensitive areas, economics of flight, and visitor experience. How well the CATFP integrates these diverse and sometimes competing elements requires careful planning on the part of the air tour provider and equally expert evaluation on |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | | | | | the part of the FAA. Inspectors based in Hawaii are more likely to have an expert appreciation for local conditions and weather / terrain elements than inspectors that may have responsibility for managing a certificate or LOA holder, but that may be based far from Hawaii. Thus the requirement to have Inspectors with an appreciation for the unique nature of Hawaii be involved in reviewing any submittals upon which approval of OpSpec/LOA B048 is based. |
| | Pgs 4-1 & 4-2, pars 4.1 through 4.3 | KSSAs, Commercial Air Tour Profiles, and Transition Segments. Again, commonality of these items on each island is paramount for the safety of all air tours in Hawaii. The maps need to be of smaller scale than the Hawaiian Islands Sectional Chart or there will not be enough detail. | Safety of Flight | Establish Common Procedures for all Hawaii Air Tour Operators. | A | Operators should collaborate with each other to establish consensus standards for areas to be avoided and common procedures to avoid congested areas and to operate within known site specific areas (KSSA) of interest in a cooperative manner. Each CH or operator is responsible for developing their own policies, procedures, and training, ideally based on collaborative consensus standard methods. Industry groups can often facilitate development of consensus standards and common procedures. |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | Pg 4-3, par 4.6.1 | This paragraph is not very clear. As written the process described is unfeasable. | Most air tour pilots fly a series of repetitive flights on any given duty day. They are required to obtain FAA approved weather prior to flying. During and after a pilot's initial flight of the day, they are a source of pilot reported weather. If a pilot, has observed that the weather is changing, their local area training should alert them to the requirement to seek updated weather information. In reality, there is no enroute weather available to a pilot other than PIREPS obtained from other pilots in their vicinity.<br><br>ADS-B In does not provide weather information in Hawaii. | Suggested rewrite:<br><br>In addition to any other regulatory requirement; when weather conditions are marginal, pilots should obtain available updated weather information while enroute. | A | For an application for B048 to be accepted, the CH or Operator requesting OpSpec/LOA B048 must establish a method for acquiring and utlizing weather information that may be provided by preceding pilots flying the same route or to the same KSSAs as the flight that intends to depart next. This provides an enhanced understanding of actual weather, observed by other company pilots flying the same route, or by pilots from other CH or operators flying the same route and voluntarily reporting their observations to other CH or Operators. In the absence of NWS approved weather observations or weather camera image sharing, pilot reports of current actual weather may supplement other official weather observations and forecasts in making aeronautical decisions while enroute to procede while planning for lateral deviations around weather or to reverse course and return to the departure point, or to cancel a given flight before departure. |
| | Pg 4-3, par 4.6.2 | Not understanding the unclear definition of an Air Tour Profile make addressing this paragraph difficult.<br><br>Hawaii air tour pilots have flown below 1500' AGL | Pilots have demonstrated over the last 30 years of air tour operations in Hawaii that the processes in this list are unnecessary. | Delete this paragraph from the AC | R | Disagree- The regulation is explicit. Accidents that continue to take lives may in most cases be avoided if the mitigations expressed in the proposed revision of OpSpec B048 and explained in the AC are implemented. The |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | under SFAR71 deviations and the HATCPM for almost 30 years. The rate of air tour accidents in Hawaii is not statistically known. Everyone wishes that the number of accidents was zero. The reality of any process in life, even those that have been through thorough risk analysis and is highly regulated, is that sometimes, the outcome that you want to occur is not going to happen.<br><br>To require a pilot conducting an air tour in Hawaii to accomplish the items in the list in this paragraph is unreasonable and unnecessarily burdensome. | | | | OpSpec offers the CH/operator the option of descending below 1,500 AGL only when unforecast or unobserved IMC is encountered. If a CH/operator does not wish to implement measures to comply with conditions and limitations in B048, those CH/Operators may continue flying commercial air tours above 1,500 AGL, and if weather deteriorates they can turn around and return to better weather conditions or declare an emergency and either land or deviate below 1,500 GL to avoid IMC.<br>The paragraph essentially requires the pilot to discontinue tour narratives, focus on flying the aircraft toward better weather conditions or making a precautionary off-airport landing, and reporting in compliance with 135.67 (via radio communication with other pilots in the vicinity and ATC/FSS of where and what kind of hazardous meteorological condition was encountered). |
| | Pg 5-1, par 5.1 | ADS-B has been discussed previously.<br><br>Requiring IFR equipment on a non-IFR certified aircraft, except for the purposes of training in preparation for flying an IFR-rated aircraft, is fraught with many problems. Air tour | Included in coment | Remove requirements for ADS-B & IFR equipment. | R | ADS-B OUT transmits an information packet of 19 elements including the broadcasting aircraft's position, altitude etc. every second, that is received directly by nearby ADS-B IN equipped aircraft and by ground stations within range. that receive and rebroadcast the same traffic information via TIS-B. |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | operations in any geographic area of the USA are conducted as a VFR flight. Any requirement to have an aircraft equipped to the standard of 91.205(d) is misguided. Many aircraft do not have instrument panel space sufficient to install the 91.205(d) instruments. | | | | Modern equipment required to meet 91.205(d) can be installed in any helicopter. |
| | | For many years we have trained our pilots to recover from inadvertent IMC. This is an accepted part of our Part 135 Training Program. To train a pilot to recover from inadvertent IMC by practicing instrument approaches in a non-IFR certified helicopter is setting the wrong example for our pilots. We need to make sure they do not fly into IMC conditions and that they know that doing so for any reason is dangerous. | | | R | The conditions and limitations for issuance of B048 includes a requirement for all pilots authorized to exercise benefits of B048 must be IFR rated in category, and all aircraft used in air tour operations authorized by B048 be equipped with instrumentation appropriate for IFR flight. Pilots should be provided with the opportunity to maintain current proficiency of their IFR skills by the Operator. |
| | | Part 91.147 and Part 135 pilot requirements do not require an instrument certified pilot. Expecting existing pilots who are not IFR-rated to perform IAPs is unreasonable. The same is true for non-current IFR-rated pilots. | | | R | Issuance of the OpSpec/LOA B048 requires all pilots engaged in air tour flight operations authorized by B048 possess an Instrument Rating for the category of aircraft involved. |

FAA000252

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | Pgs 6-2 & 6-3, par 6.3 | All items in this list are part of our Part 135 pilot training program. If Part 91 operators need to specify means of compliance with various aircraft specific training topics, list this as such in the AC. | Avoid redundancy in our manuals | Add language to the paragraph making it clear that Part 135 CHs can include this in their TP. | A | Revise AC 6.3 to clarify- Air tour procedures and flight training should be considered part of the normal training program where possible and a separate curriculum segment within the Training Program where it is specific and solely involving air tour operations. |
| | Pg 6-3, pars 6.4.3 & 6.4.4 | 6.4.3 and 6.4.4 seem to be contradictory. Some aircraft like our AS350B2 do not have a complete set of dual flight controls. There is no access to the pilot's throttle quadrant in the copilot position. | It is not clear why the position of the instructor and the pilot receiving instruction should be addressed in this AC. | Remove hese paragraphs. | R | Hawaii air tour weather, terrain, traffic density, and other specific concerns should be addressed within the training and checking process by pilots who are well experienced local experts. The air tour specific flight instruction should be provided by such experts. |
| | | | If the FAA believe that a commercial pilot receiving instruction under Part 135 need to be treated as if they do not know how to fly below 1500' AGL just because they are being trained to fly a tour flight? | | R | The KSSA-qualified instructor may be designated as PIC for the purpose of making command decisions as necessary during the flight while the pilot receiving KSSA familiarization / instruction can simultaneously be the sole manipulator of the controls. The text in 6.4.3 and 6.4.4 amplifies the pilot in command authority of the Instructor while allowing for the pilot receiving instruction to manipulate the controls. The pilot receiving KSSA instruction should already be fully trained per the part 135 FAA approved training program and checked in accordance with 135.293 or against |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | | | | | the 91.147 operator's training program or and checked in accordance with the part 91.147 operator's established pilot qualification procedures by the operator. |
| | Pg 6-4, par 6.6 | 6.6 this paragraph does not define what a "representative number of flights" is. | It is unrealistic for an observation flight by a designated check pilot acceptable to the administrator to take multiple flights. | Reword paragraph 6.6 to state "the Administrator will conduct an initial observation of each CH or operator air tour flight instructor before authorizing the instructor to conduct air tour flight instruction." | A | Revised AC to state: "The FAA Inspector or FAA authorized air tour operations observation pilot will conduct an initial observation of each CH's or Operator's air tour operations instructor while the instructor provides training in procedures and maneuvers in accordance with AC Section 6. The performance of the instructor being observed must be accepted by the observer before the conditions and limitations are satisfied and the instructor may be accepted as an air tour operations instructor by the FAA." |
| | | | | | | Editor's note: Paragraph 6.6 language per 5/31/24 draft: "The CH's or operator's training should specify that the FAA inspector or FAA-authorized air tour operations observation pilot will conduct an initial observation of each CH's or operator's air tour operations instructor while the instructor provides training in procedures and maneuvers in accordance with Chapter 6. It is essential the performance of the instructor being |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | | | | | observed is satisfactory before the conditions and limitations are satisfied and the instructor may be accepted as an air tour operations instructor by the FAA." |
| | Pg 6-4, par 6.6.1 | Pilot record retention requirements should mirror those of Part 135. | Harmonizing the HATCPM with Part 135 training requirements was part of the reason we starting looking at revising the HATCPM that this AC is meant to superceed. | Change the paragraph to align the training records requirements with Part 135 | A | Pilot ground and flight training records pertaining to air tour operations should reflect part 135 pilot training record keeping policies and procedures. The AC should be revised to express this, and provide for specific records for air tour training for each air tour profile or island specific unique nature of climate and terrain influence upon the aeronautical decision making required to safely navigate the profile, and KSSA ingress/egress points, radio calls, landmarks commonly used to describe locations of flight hazards, traffic circulation patterns at KSA's, etc. Editor's note: Paragraph 6.6 was reorganized in POC updates provided 5/31/24. |
| | Pg 6-5, par 6.7.1.3.2 | 6.7.1.3.2 and 6.6.1 seem to be in conflict | | | A | 6.6.1 does not exist, the comment seems to reflect 6.7.1 vs 6.7.1.3.2, Revised AC text to harmonize these two sub-sections. Editor's note: Paragraph 6.6 was reorganized in POC updates provided 5/31/24. |

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | Pg 6-5, par 6.8.1 | Bullet points related to IFR indicate that the FAA is approving IFR flight in non-IFR certificated aircraft by non-IFR-rated/current pilots and should be eliminated.<br><br>Bullet points related to pilot training should be delineated as applicable to Part 91.147 operators. Part 135 operators already have these subjects in our Part 135 Training Programs. | Per previous comment about IFR equipment. Training of pilots on IFR subjects when they are not required to be IFR certified pilots and our aircraft are not capable of being certified for IFR flight is contrary to any logic or regulatory basis. | Remove the references to IFR training | R | By regulation, commercial air tours are intended to be flown in VFR only. The FAA is by no means condoning routine IFR flight in non-IFR equipped and certified helicopters, flown by pilots who are not IFR rated in category. But, given that OpSpec B048 requires pilots to be instrument rated in category and in consideration of the characteristics of weather in Hawaii, IIMC recovery is a potentially life saving tool that should be available to the predominantly VFR experienced, IFR rated pilot. IIMC recovery is an emergency maneuver. An Emergency should be declared. This allows the pilot to deviate from any regulation to the extent necessary to successfully deal with the emergency. Under this OpSpec authorization, the aircraft does not have to be IFR certified. It is a last viable option to be exercised only after all other efforts to avoid IMC by lateral or vertical deviation in accordance with OpSpec B048 fail, and where a precautionary off-airport landing is not an option due to terrain and/or vegetation. Cue based weather training, and myriad other potential solutions have been tried and have not succeeded in sufficiently mitigating LOC or CFIT accidents by avoiding IIMC |

FAA000258

| Company & Group | Page & Para | Reviewer's Comment | Reviewer's Rationale for Comment | Reviewer's Recommendation | OPR Accept (A) Reject (R) | OPR Disposition |
|---|---|---|---|---|---|---|
| | | | | | | conditions. The alternatives to CHs and operators facilitating the emergency IIMC escape and recovery procedure in a helicopter that is not certificated for flight under IFR but is equipped with essential instrumentation, flown by pilots that are IFR rated and who have been trained to execute the IIMC recovery procedure include: 1) flying commercial air tours only when IMC conditions at the altitudes commercial air tours occupy can reasonably be expected to not occur, 2) CHs or operators may require all their commercial air tour pilots be IFR proficient and to purchase and operate only IFR certified helicopters, at their discretion. |
| | Pgs 6-6 & 6-7, Table 6-1 | References to IFR training should be removed from the table. | See rational in the previous comment about IFR subject.  Safety of flight | Remove references to IFR from table | R | Most IFR rated air tour helicopter pilots received IFR training and a IFR rating checkride in a non-IFR certificated helicopter.  These pilots generally have zero actual instrument experience.  There are no IFR certified single engine civil helicopters. |
| Bonnie Chan  bfchan808@ gmail.com | General | I'd like to comment on the proposed rules. I have been asking my federal legislators to do SOMETHING about the increased noise from early morning though late at night due to helicopters. However, it seems the majority of helicopters that | | | R | Outside of scope.  Raising the minimum altitude to 1,500 AGL should reduce the amplitude of aircraft noise. FAA has no jurisdiction over VFR military flight operations. |

| | | | | | |
|---|---|---|---|---|---|
| | Pg 1-3, par 1.7.7; Pg 4-1, par 4.1.1 | What will connote a Known Site-Specific Area (KSSA)? The AC leaves it open for any operator to develop a KSSA anywhere they want. This could lead to all kinds of noise complaints and safety issues if two operators develop different procedures for the same KSSA. | | The KSSA and the procedures should be standardized by the FSDO with input from tour companies. Perhaps a list from the HATCPM could be agreed upon. | R | KSSA designation is the CH or Operator responsibility, but all CH and operators are encouraged to meet to collaborate on KSSA identification and development of common methods for ingress, egress, traffic circulation about the KSSA, and radio CTAF calls. The AC and the OpSpec B048 address safety risk mitigation, the minimum altitude of 1,500 AGL has a secondary benefit of reducing noise. In no event should a KSSA be overflown at an altitude less than 1,500 AGL. |
| | Pg 4-1, pars 4.1.2 & 4.1.3 | Paragraph 4.1.2 Commercial Air Tour Flight Profiles, 4.1.3 Transition Segments – These sections are very vague. However, they are critical to how companies operate. Without any guidance from the FSDO there will be a dozen different ways that these can be accomplished. Again, a lack of standardization will lead to a high risk in the industry. | | I would recommend that all companies work to develop maps that we will all agree to submit to the FAA and follow. | R | Transition Segments are intentionally non-specific, as this supports wide corridors of flight paths rather than single bright lines. If a transition route is depicted as a single line, public expectations infer all flights will fly exactly along that dimensionless line. Instead, if a corridor is depicted, the public may expect flights could procede anywhere within the boundaries of the corridor exposing fewer locations to constant overflights while providing the commercial air tour provider many options to avoid showers or localized low ceilings by deviating laterally rather than descending below 1,500 AGL. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Pg 4-1 & 4-2, pars 4.2.1 & 4.2.2 | This is perhaps the most telling paragraph in regard to the author's inappropriate level of knowledge about Hawaii and Helicopter operations.<br><br>It states, "Specific radio frequencies for each KSSA are recommended to be established and monitored while conducting operations in and around the KSSA until it is necessary to switch frequencies. The CH or operator is recommended to have established position reports, as outlined in each of their specific island and operator designed KSSAs."<br><br>Not only are we not allowed to just establish radio frequencies, but this also leaves the door open for each operator coming into a congested area and being on different frequencies and proceeding in different ways that are unknown to other operators. The risk implication in this paragraph is very high. | | | A | The CH and operators should collaboratively establish local volumes of space where all flights would be best served to communicate position and intentions and weather information on a frequency that all providers should be monitoring.  **The FAA believes that CTAFs for each KSSA region has already been assigned.  If this is not the case the tour operators should petition the FAA for assignment of a CTAF for each volume of airspace lacking a CTAF. [THIS NEEDS MORE ELABORATION ABOUT HOW CTAFs ARE ASSIGNED, WHO IS RESPONSIBLE FOR ASSIGNING, WHO THE PETITION SHOULD BE ADDRESSED TO, ETC.  NOT ENOUGH GUIDANCE PROVIDED]**<br><br>Editor's note: Asked POC on 6/13/24 "Does any specific language in AC 136-B048 need to update based on this response?"<br><br>POC response: "As the response to the comment states Operators should be responsible for establishing a collaborative approach for communication, etc. A common traffic advisory frequency (CTAF) is established by Air Traffic Control and there are already designated air to air frequencies identified in |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | <span style="color:red">publications such as the Airman's Information Manual (AIM).<br><br>In the AC there is a note in section 4.2.2 directing operators to consult with the local FCC office which is how they would establish a different CTAF from the already published.<br><br>No further language is needed."</span> |
| | Pg 4-2, par 4.2.3 | | | This shows the overall weakness of the AC in that too much is "recommended," and not standardized when it comes to actual operations.<br><br>This paragraph should have stated that all aircraft who fly tours in the state of Hawaii are required to be equipped with ADS-B in and out. | R | If the FAA were to mandate ADS-B IN and OUT for all flights within certain volumes of airspace for all users of that airspace, ruelmaking would be needed. In the case of this AC and this OpSpec B048, to procede with approval of the safe descent below 1,500 AGL solely to avoid weather, the FAA has required ADS-B IN and OUT with other conditions and limitations. This includes the installation of the equipment if not already installed and the training of their pilots in use of ADS-B for traffic awareness and avoidance. |
| | Pg 4-2, par 4.3 | Although, according to the AC, all tours must be above 1500ft AGL and that the deviation is to allow flight below this for weather avoidance only, it is unclear if that includes KSSA. Can flight in the KSSA be conducted down to 500ft AGL? | | In addition, there is no mention of remaining out of the Height/Velocity curve or if we are allowed to legally deviate below 1500ft AGL for traffic avoidance. This should be explicitly stated in the AC that deviation allows for flight below 1500ft AGL for traffic avoidance. There should be no | R | Flights segments below 1,500 AGL are not to be flown as tour segments. As was previously stated, when the pilot must invoke B048 authorization to descend below 1,500 AGL the pilot must: 1) discontinue any tour narrative and flight profile, 2) must focus their attention on safely navigating the area at an altitude below 1,500 AGL and |

| | | | | | |
|---|---|---|---|---|---|
| | | and in-flight decision-making. | | | | |
| | General | **Automatic Dependent Surveillance-Broadcast Equipment Applications**<br><br>During our investigation of a 2019 fatal midair collision involving two air tour airplanes in Ketchikan, Alaska, we observed that high-traffic air tour areas have a higher midair collision risk than the general National Airspace System (See our report, *Midair Collision over George Inlet, de Havilland DHC-2, N952DB, and de Havilland DHC-3, N959PA, Ketchikan, Alaska, May 13, 2019. AAR-21/04.* Washington, DC: NTSB, 2021.) As a result, in 2021, we issued Safety Recommendation A-21-15, which urged the FAA to do the following:<br>    Identify high-traffic air tour areas and require, through a special federal aviation regulation (SFAR) or other means, that 14 CFR Parts 91 and 135 air tour operators that operate within those | In 2022, we issued Safety Recommendation A-22-13 (also from our report on the Kekaha accident), which urged the FAA to require, as an interim measure until the completion of action to satisfy Safety Recommendation A-21-15, that Hawaii air tour operators install ADS-B Out equipment in their aircraft to enable real-time flight position tracking. In August 2022, the FAA informed us that it was revising OpSpec B048/ LOA B548 and that it was continuing to evaluate requirements for the use of ADS-B Out equipment in air tour operators' aircraft as a requirement to obtain the revised OpSpec B048/ LOA B548. Pending review of the revised OpSpec and LOA and completion of the recommended action, Safety Recommendation A-22-13 is classified Open—Acceptable Response. | We note that, although the draft AC recommends that Hawaii air tour operators install ADS-B equipment with In and Out capability and inform the FAA about its use, the AC does not state that such equipment will be required. Therefore, after the AC is issued, the FAA will still need to complete the revisions to OpSpec B048/LOA B548 to satisfy Safety Recommendation A-22-13. | A | The requirement for ADS-B OUT to be installed in all Commercial Air Tour aircraft to which B048 will be applicable is expected to cover the majority of such aircraft in Hawaii.<br><br>Commercial Air Tour operations in Known Site Specific Areas (points of interest) and along enroute flight segments to and from KSSAs throughout Hawaii are exposed to known high density traffic areas. Collision mitigations should include the following: Special Flight Rules Areas that would identify the airspace within which flights are at higher risk of collision, that would require all aircraft operating within the identified airspace to be ADS-B OUT equipped, and that all air tour aircraft be further required to equip their aircraft with ADS-B IN receivers and visual displays depicting all known ADS-B traffic within reasonable lateral and vertical boundaries. Audible warning systems controlled by nuisance alert avoidance software would provide the basis for action limits. Air tour pilots would |

| | | | | | |
|---|---|---|---|---|---|
| | | areas be equipped with an automatic dependent surveillance-broadcast (ADS-B) Out- and In-supported traffic advisory system that 1) includes both visual and aural alerts, 2) is driven by an algorithm designed to minimize nuisance alerts, and 3) is operational during all flight operations.<br><br>Due to the presence of similar risks in high-traffic air tour areas in Hawaii, as well as the usefulness of ADS-B broadcast data for monitoring air tour flights and potentially detecting deviations from safe operating practices (discussed further below), we reiterated Safety Recommendation A-21-15 in our 2022 report on the Kekaha accident. However, the FAA recently informed us that it determined that current ADS-B requirements adequately address the needs of aviation safety and that it did not plan to pursue any additional ADS-B requirements at this time. | | | require training in avoidance procedures.<br><br>Use of ADS-B data could be used to identify compliance and safe practices deficiencies, which could lead to appropriate interventions, counselling, publication of systemic findings, FAAST outreach efforts, and if appropriate, enforcement action. |

| | General | Safety Recommendation A-22-18 (also from our report on the Kekaha accident) urged the FAA to issue and periodically update a special airworthiness information bulletin (SAIB) that lists newly manufactured helicopters that are equipped with features likely to reduce accidents resulting from inadvertent encounters with IMC, describes retrofit options for helicopters that do not have such equipment, and encourages the voluntary integration of these safety features. This recommendation is classified Open—Await Response. | Although this recommendation specifically called for the publication of an SAIB, we note that the draft AC does not encourage voluntary integration of such safety features. It does, however, state that an operator should include in its application a description of any supplemental type certificates related to aircraft instrumentation and equipment. Therefore, although the draft AC is not responsive to Safety Recommendation A-22-18, we are pleased that it may increase the FAA's awareness of any such equipment that may be installed. | | A | Chapter 5 of the AC supporting B048 suggests the kinds of instruments and equipment that should be installed in every aircraft used in the conduction of commercial air tours within the state of Hawaii. It includes all instruments and equipment required under 91.205(d), that support IFR operation, even in aircraft that are not certificated for intentional flight in IFR, and a navigation system capable of supporting the execution of at least one kind of instrument approach available in the vicinity of the air tour operation. OpSpec B048 cannot be issued unless the above suggested instruments and equipment is installed in the aircraft. Although air tours can still be conducted above 1,500 AGL it is likely the majority of commercial air tour providers will opt to equip their aircraft to take advantage of B048. |
|---|---|---|---|---|---|---|
| | General | **Additional Recommendations Not Addressed in the AC**<br><br>In addition to the recommendations discussed above, we have identified the following NTSB safety recommendations to the FAA that are relevant to Hawaii air tour safety but whose subject matter is not discussed in the draft AC: | | We encourage the FAA to consider including the subjects addressed in these recommendations in the AC. | R | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | • Safety Recommendation A-22-14: Require air tour operators to have flight support personnel who are trained to exercise operational control authority, participate in preflight risk analysis, provide pilots with weather briefings, monitor the progress of the flights, and participate in two-way communications with pilots to alert them of any weather hazards. (Open-Unacceptable Response) (Both Safety Recommendation A-22-11 and -14 were issued in our 2022 report on the Kekaha accident.) | | | A | This is outside the scope of B048 and will be addressed separately.<br><br>Editor's note: No changes required for this document. |
| | General | **HATCPM Provisions Not Included in the AC**<br><br>We would like to express concern about some provisions of the HATCPM that are not included in the draft AC. The HATCPM included a standoff distance of 300 ft from raw terrain, which the draft AC does not address. | | We believe that the inclusion of a standoff distance in the new AC would be appropriate to discourage pilots from flying too close to steep terrain, which is prevalent in Hawaii. Maintaining a minimum distance from terrain reduces the risk of an inadvertent collision with terrain due to adverse wind conditions or other factors and provides a safety margin for helicopters to transition to an autorotative maneuver in the event of unexpected power loss. | A | Revised AC 4.9 Prohibited Operations text: to recommend "1,500 feet lateral standoff distance for persons, vehicles, and structures, to include precipitous terrain." (Not required by 136.75(d)(3).)<br><br>Editor's note: Paragraph 4.9 language per 5/31/24 draft: "The CH or operator should include a description of their specific prohibited operations, if any. For example, CHs and operators may choose to prohibit special VFR departures. Special VFR departures |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | are not prohibited by § 136.75(d). However, in the case of a special VFR departure within controlled airspace, if it is not possible to climb unrestricted to 1,500 AGL before leaving the Class D or C airspace and entering the Class E airspace, the air tour flight may not be able to comply with § 136.75(d) and should be postponed. Razorback ridge crossing at or above 300 AGL is no longer permitted; all terrain must be crossed at or above 1,500 AGL. Lateral separation between the aircraft and persons or property is limited to a minimum of 1,500 feet. Lateral separation between the air tour aircraft and precipitous terrain is not established by regulation. OpSpec/LOA B048 will recommend CHs and operators to establish a minimum lateral separation between precipitous terrain and the air tour aircraft flight path of not less than 1,500 feet." |
| | General | The HATCPM also required operators to identify site-specific emergency landing areas for locations where they are permitted to fly at or below 1,000 ft above ground level (agl) and train their pilots on the location of these landing areas. | We are concerned that the omission of this requirement from the draft AC will reduce forethought and planning among operators and pilots about where flights may be able to land in the event of unforeseen power loss when operating at lower altitudes. When such events occur, the time available to identify a suitable landing area may be minimal; therefore, such | | A | Revised AC text 6.1.2 to require operators to emphasize the continuous in-flight identification of adequate precautionary and emergency helicopter landing sites, and to avoid flight over areas where such sites may not be available in KSSAs and in transition areas, and to provide specific training and checking in such continuous awareness and ability to utilize identified off airport landing sites in the event of |

| | | | | | |
|---|---|---|---|---|---|
| | | advance planning can contribute to risk management, thereby adding a layer of safety. | | | an emergency or pre-cautionary off airport landing. This becomes especially important when deviating below 1,500 AGL for the purpose of avoiding IMC in cloud. |
| | General | In addition, the HATCPM specified certain minimum visibilities. For air tour flights below 1,500 ft agl, it required pilots to maintain 3-statute-miles visibility over land and 1 statute mile over offshore transition routes. This was substantially more conservative than the requirement under Part 135, which specifies, in part, that daytime, visual flight rules (VFR) helicopter flights conducted in class G airspace at an altitude of 1,200 ft agl or less must be flown in visibility of at least 0.5 miles (14 CFR 135.205[b][1]) and with visual surface reference sufficient to safely control the helicopter (14 CFR 135.207). | | The draft AC does not include a minimum visibility provision for Hawaii air tour operators that is more conservative than the requirements under Part 135. This could reduce operational safety margins. | A | Revised AC 5.1 to enhance B048 Conditions and Limitations to require minimum visibility of 3 miles over land and 2 miles over off-shore transition areas while maintaining auto-rotational distance to the shoreline and keeping the shoreline in sight. If visibility deteriorates below these values, and the flight is in rain, the pilot should execute an escape procedure such as: changing course toward lower terrain and known improved visibility, descending below 1,500 AGL but not below 500 AGL, as needed, and if conditions do not improve, executing a pre-cautionary off airport landing where possible. If over water, the pilot should reduce speed and procede at Vmini toward the closest, known, area of better visibility conditions accessible without crossing higher terrain, and prepare to execute an IIMC escape procedure. |
| | General | We believe that the elimination of a conservative visibility requirement for Hawaii air tour operators is of particular concern given that the FAA has indicated that the purpose of the draft | The FAA imposed this minimum altitude requirement on October 26, 1994, as part of an emergency rule, SFAR 71. In support of the rule, the FAA said that imposing the | We note that the FAA's review also found no evidence that minimum altitude requirements prevented such weather-related accidents. Instead, the FAA's analysis seemed to suggest that minimum altitude requirements | R | No additional response, already covered in 5.1 revision discussed above. |

| | | | | | |
|---|---|---|---|---|---|
| | | | FAA acting administrator to the chair of the NTSB, December 2, 2008, in response to Safety Recommendation A-07-63.) The FAA performed a case-by-case evaluation of the eight weather-related accidents that occurred after the implementation of SFAR 71 and concluded that minimum altitude requirements played no role in them and that the involved pilots had flown into areas of deteriorating weather for other reasons. | | |
| | General | **Positive Aspects of the AC**<br><br>The NTSB's concerns notwithstanding, there are several inclusions in the draft AC that were not present in the HATCPM that we believe will raise the bar for the safety of air tours in Hawaii. These include:<br>• A provision stating that operators should present to the FAA copies of certain pilot training courseware.<br>• A provision stating that, in the event a pilot has to deviate from an operator's accepted operating procedures or regulatory requirements, the pilot should report the deviation event to the chief pilot or | | A | |

| | | | | | |
|---|---|---|---|---|---|
| | | designated supervisor within 24 hours.<br>• A statement indicating that, before departure on each individual commercial air tour flight, and in addition to any other regulatory requirement, when weather conditions are marginal or available weather information is minimal prior to departure, pilots should obtain updated weather information while en route.<br>• A recommendation that operators equip their aircraft with instrumentation as required by 14 CFR 91.205(d), instruments and equipment capable of conducting at least one instrument approach procedure, and an operable ADS-B In and Out system.<br>• provision stating that operators should include in their procedures and training the procedures to be followed when unforecasted weather below the allowable minimums is encountered.<br>• A provision stating that operators should establish communication procedures | | | | |

| | | and actions to be taken by the pilot that explain the manner in which the flight may be continued in the event that there is a need to operate at an altitude below 1,500 ft above the surface to avoid entering IMC. The AC states that the communication procedures should include area of flight, call sign, position (using cardinal directions), altitude, and intentions.<br>• Provisions stating that pilot training for autorotation, hover autorotation, and inadvertent IMC encounters should be conducted in the specific aircraft that is to be used during tours.<br>• A recommendation that operators have established position reports, as outlined in each of their specific island and operator-designed known site-specific areas (KSSAs), including procedures for entering, transiting, or exiting a KSSA.<br>• A reminder that when potentially hazardous meteorological conditions are encountered, reporting those conditions in | | | | |
|---|---|---|---|---|---|---|

| | | | | | |
|---|---|---|---|---|---|
| | | accordance with 14 CFR 135.67 is mandatory.<br>• A provision stating that an operator's new hire, initial, and recurrent pilot training should include training on ditching procedures appropriate to equipment being operated. | | | |
| Congressma n Ed Case<br><br>Washington, D.C.: 202-225-2726<br><br>Honolulu: 808-650-6688 | General | Please accept these comments on the Draft AC on behalf of residents of Hawai'i whose communities are directly impacted by the severe safety risks and increasing ground disruption of commercial air tour operations throughout Hawai'i.<br><br>Our concerns relate to clearly unsafe operational conditions, as evidenced most directly by the tragic accidents of recent years. These operations not only pose risks to aircraft occupants but to residents and property on the ground.<br><br>They also relate to increasing noise, vibration and visual disruption on the ground, which repeatedly disturbs national, state and county parks and natural resources, cemeteries and memorial sites, military installations, harbors and other | By way of context, I directly represent some 700,000 residents of Hawai'i in the First Congressional District (Urban/Suburban Honolulu), and formerly represented and indirectly represent some 700,000 more residents in the Second Congressional District (Remainder of O'ahu and All Other Islands). I believe that my comments represent mainstream resident concerns with proliferating air tour helicopter and small aircraft operations in all parts of Hawai'i, from the most urban to the most remote. This is reflected in part by resolutions in recent years expressing such concerns by the Hawai'i State Legislature, the Councils of all Hawai'i counties, and many governing community boards including most on the most populated island of O'ahu, as well as state legislative proposals and laws providing | | R | This amendment of OpSpec/LOA B048 is designed to mitigate several factors that have been determined to be causes of fatal accidents. The minimum operating altitude for all air tours has been increased to 1,500 AGL, except in the case of unreported or unforecast lower ceilings that were not known at the time of takeoff and that can be safely avoided by descending to a limited lower altitude and only to the extent necessary to avoid the low ceiling. This primary safety improvement reduces the probability of a flight inadvertently entering clouds or instrument meteorological conditions (IMC) which accounted for the vast majority of air tour accident fatalities recorded in the past decade. These deviations are authorized to be performed only by operators who have invested in equipment, and in training and checking of pilots that is much more extensive than previously required. The aircraft must be equipped with instrumentation that supports emergency flight |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | near the mountains. Allowing tour operators to fly below the 1,500 ft level will further endanger our communities and exacerbate the already disruptive noise levels.<br><br>The only win-win solution is to require tour helicopters to fly off-shore. Tourists will be able to enjoy our beautiful islands and Kamaaina can live in peace.<br><br>I support Rep. Case's comments regarding the proposed FAA rules. | | | | |
| Rainbow Helicopters<br><br>Nicole Battjes<br><br>nicole@rainbowhelicopters.com | Pg i, par 2;<br>Pg 1-1, par 1.1 | Verbiage for review: These authorizations are granted with conditions and limitations to enable CHs or operators to remain in visual meteorological conditions (VMC) and avoid entering unforecasted instrument meteorological conditions (IMC). The authorization is not intended to be used for flight planning, and does not authorize a CH or operator to conduct a commercial air tour operation when the forecasted weather conditions would not permit the operation to remain in VMC at altitudes above 1,500 feet above the surface for the duration of the planned flight.<br><br>Reviewer's comment: | We appreciate the effort to mitigate any risk of helicopters inadvertently entering IMC conditions. However, we believe that this paragraph does not address the root of the issues with the current Hawaii Air Tour Common Procedures Manual: more specifically, the vague and rudimentary maps that are out of date and do not address the current actual locations of challenging weather on all of the islands around which helicopters would need to deviate for safety. By including what could be interpreted as blanket restrictions on the tour operators' ability to take off "when the forecasted weather | We recommend a broader statement throughout the entirety of the document that allows the operators to deviate in known challenging areas to 1000 ft AGL and other transition areas with custom altitudes based on the terrain as laid out by the operator that may be specific to each island; for example, transitioning over the Ko'olau mountains on Oahu. In this way, it opens up the ability for the operators to design commercial air tour profiles that are relevant and can be refined as climates change and operators adapt. In our experience, a safe tour can be conducted with small deviations below 1500 ft around the island where needed, and the pilots need to | R | The HATCPM is obsolete and is being archived. The FAA intends to revise the B048 OpSpec/LOA and supporting Advisory Circular. The dynamic nature of Hawaii weather and adequate mitigations of the risk of IIMC and resulting loss of control or controlled flight into terrain accidents cannot be addressed without investment in appropriate equipment, strict compliance with operator developed policies and procedures, and appropriate training of flight crewmembers and ground support personnel. The AC and OpSpec B048 establish recommendations for all air tour operations conducted in Hawaii, and specify conditions and limitations for those operators who choose to participate in order to authorize descent below 1,500 AGL for the extent |

| | | | | |
|---|---|---|---|---|
| | | Rainbow Helicopters has extensive experience conducting high-volume tours on the island of Oahu. The company supports the intent to remain at 1500 ft for the purposes of sightseeing as a general statement. However, due to the dynamic tropical climate of the islands, there are many instances in which small altitude changes can be conducted around the island that would greatly increase safety and decision-making for the pilots, without any increased risk to persons or property on the ground. For example, a pilot may need to decrease altitude to 1000-1499 ft in an area to avoid a small cell of unexpected and unforecasted island weather. In this way, the pilot makes a safe decision to avoid the weather and not fly too close to the clouds, as to create an emergency situation. This paragraph, as worded, would create a challenging decision-making environment for the pilot because the pilot does not have prior permission to deviate in KNOWN areas of unforecasted weather. Instead, the paragraph states that the companies do not have permission to take off when the forecasted weather | conditions would not permit the operation to remain in VMC and 1500ft," the proposed AC overlooks that in Hawaii, there are many locations that are remote and without precise weather forecasting. Instead, the proposed AC creates the potential for confusion and fear for the pilots when they encounter unforecasted weather in Hawaii, which is a common occurrence. The AC does not account for the dynamic changing nature of the weather in Hawaii and overlooks the majority of the areas that may be challenges for pilots and which may create the potential for unsafe decision making in the air. | be trained and encouraged to deal with this known common weather. The blanket statement that the pilots cannot takeoff unless the forecasted weather conditions permit it to stay at 1500 ft would not address, by our estimation, 60% of the geographic locations throughout the Hawaiian islands and therefore this approach has large gaps in accomplishing the goal of safer skies.<br><br>We recommend a broader approach that includes the ability to deviate when needed, along with other appropriate altitude boundaries so that the pilot is equipped to deal with the actual trends of tropical weather in the Hawaiian Islands.<br><br>Verbiage recommendation:<br><br> These authorizations are granted with conditions and limitations to enable CHs or operators to remain in visual meteorological conditions (VMC) and avoid entering unforecasted instrument meteorological conditions (IMC). The authorization is not intended to be used for flight planning. Deviations below | | necessary to avoid low ceilings. Alternatively, air tours may be conducted only in Class E airspace above 1,500 AGL at all times, in compliance with existing regulations pertaining to VFR minimums. |

FAA000343